Approved: _____
         JENNIFER L. BEIDEL
         Assistant United States Attorney

Before:  THE HONORABLE SARAH NETBURN
         United States Magistrate Judge
         Southern District of New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA             :   **SEALED COMPLAINT**
                                     :
       - v. -                        :   Violation of
                                     :   18 U.S.C. § 1349
NANCY CREDIDIO,                      :
  a/k/a "Nancy Schwartz,"            :   COUNTY OF OFFENSE:
                                     :   NEW YORK
               Defendant.            :

- - - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

      MICHAEL BIRLEY, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation (the "FBI"), and charges as follows:

### COUNT ONE
(Conspiracy to Commit Wire and Mail Fraud)

      1.  From in or about 2013 up to and including in or about 2015, in the Southern District of New York and elsewhere, NANCY CREDIDIO, a/k/a "Nancy Schwartz," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud, in violation of Title 18, United States Code, Section 1343, to wit, CREDIDIO conspired to submit false applications for automobile insurance policies.

      2.  It was a part and an object of the conspiracy that NANCY CREDIDIO, a/k/a "Nancy Schwartz," the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false

Approved: _____
        JENNIFER L. BEIDEL
        Assistant United States Attorney

Before: THE HONORABLE SARAH NETBURN
        United States Magistrate Judge
        Southern District of New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA           :    **SEALED COMPLAINT**
                                   :
    - v. -                         :    Violation of
                                   :    18 U.S.C. § 1349
NANCY CREDIDIO,                    :
    a/k/a "Nancy Schwartz,"        :
                                   :    COUNTY OF OFFENSE:
                    Defendant.     :    NEW YORK
                                   :
- - - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

        MICHAEL BIRLEY, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation (the "FBI"), and charges as follows:

**COUNT ONE**
(Conspiracy to Commit Wire and Mail Fraud)

        1.    From in or about 2013 up to and including in or about 2015, in the Southern District of New York and elsewhere, NANCY CREDIDIO, a/k/a "Nancy Schwartz," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud, in violation of Title 18, United States Code, Section 1343, to wit, CREDIDIO conspired to submit false applications for automobile insurance policies.

        2.    It was a part and an object of the conspiracy that NANCY CREDIDIO, a/k/a "Nancy Schwartz," the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false

and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

3.  It was further a part and object of the conspiracy that NANCY CREDIDIO, a/k/a "Nancy Schwartz," the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice and attempting so to do, would and did place in a post office and authorized depository for mail matter, matters and things to be sent and delivered by the Postal Service, and did deposit and cause to be deposited matters and things to be sent and delivered by private and commercial interstate carriers, and would and did take and receive there from, such matters and things, and would and did cause to be delivered by mail and such carriers according to the directions thereon, and at the places at which they were directed to be delivered by the person to whom they were addressed, such matters and things, in violation of Title 18, United States Code, Section 1341.

(Title 18, United States Code, Section 1349.)

4.  I am a Special Agent with the FBI.  This Complaint is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals.  Because this Complaint is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### Background on the New York Automobile Insurance Industry

5.  Based on my participation in the investigation, and my conversations with others, I have learned, among other things, that:

2

a. In the state of New York, in order to legally drive a car, the car must be covered by an insurance policy.

b. Insurance policies are underwritten by private companies (the "carriers").

c. The vehicle insurance market in New York State is divided into two subsets, the "voluntary market" and the "residual market." In the voluntary market, the carriers choose to offer insurance policies to customers. Individuals or entities unable to obtain insurance through the voluntary market can get insurance through the New York Automobile Insurance Plan (the "NYAIP"), an entity established pursuant to New York State Insurance Law. After a policy application is submitted to the NYAIP on behalf of an applicant, the NYAIP assigns the application to a carrier and forwards the assigned carrier the application by mail. The carrier to which NYAIP assigns the application is required to provide the insurance coverage to the applicant.

d. Agents for the carriers ("producers") advertise and sell insurance policies directly to consumers. Producers are compensated for their services through brokerage fees, which are charged to the consumers, and commissions, which are paid by the carriers. NYAIP caps the brokerage fees that can be charged to a consumer at $50 per application for private driver applications. This cap is designed to limit consumer costs and to account for the nature of the risk that NYAIP typically insures through its consumer policies.

e. When producers submit applications to the NYAIP, they do so in two ways. First, an application is electronically transmitted by the producer to the NYAIP's parent entity's office ("AIPSO") in Rhode Island. AIPSO subsequently transmits the application electronically to the NYAIP's office in New York, New York. Second, the producer must also mail a hard copy of the application to the NYAIP's office in New York, New York.

**Overview of Fraudulent Practices at Blackstone**

6. Based on my participation in the investigation, my conversations with other law enforcement agents and others, and my review of records obtained through grand jury subpoenas, I have learned, among other things, that since in or about 2010 through the present, NANCY CREDIDIO, a/k/a "Nancy Schwartz," the defendant, together with another individual ("CC-1"), manages a producer in Queens, New York, called Blackstone Insurance

Brokerage ("Blackstone"). Blackstone brokers insurance for, among other things, personal and commercial vehicles.

7. As part of the investigation, I interviewed a former employee of Blackstone ("CW-1").[1] During that interview, CW-1 stated, in substance and in part, that:

a. CW-1 worked at Blackstone between in or about October 2012 and in or about May 2013.

b. CW-1's responsibilities included, among other things, processing applications for insurance policies.

c. During the time that CW-1 worked at Blackstone, CW-1 was supervised by NANCY CREDIDIO, a/k/a "Nancy Schwartz," the defendant. While CW-1 worked at Blackstone, CREDIDIO was the only "Nancy" working there. CW-1 also identified an email account used by CREDIDIO at Blackstone (the "Credidio Email Account"). CW-1 further identified CREDIDIO's signature (the "Credidio Signature").

d. According to CW-1, only CREDIDIO and CC-1 submitted applications to the NYAIP. Other employees were not permitted to do so.

e. At CREDIDIO's direction, CW-1 participated in a number of fraudulent practices at Blackstone, including, but not limited to:

i. Charging broker fees in excess of the $50 limit set by the NYAIP, while claiming to the NYAIP that Blackstone was charging $50. CW-1 described, in substance and in part, how CREDIDIO and Blackstone would inflate the cost of a roadside assistance program (a "RAP") sold to consumers to hide the fact that Blackstone was receiving broker fees in excess of the $50 limit.

---

[1] CW-1 received a sentence of probation after pleading guilty to bank fraud. CW-1 cooperated with the investigation in the hope of receiving a more lenient sentence and continues to cooperate with the investigation in the hope of receiving immigration benefits. To date, the information provided by CW-1 has proven reliable, and has been corroborated by independent evidence, including documentary evidence.

4

   ii. Falsely claiming to carriers that consumers qualified for certain discounts, such as discounts for defensive driving courses or daytime running lights, when in fact the consumers did not qualify for those discounts.  The purpose of these false statements was to induce the carriers to underwrite the insurance policies at lower premiums, thus increasing the likelihood that the consumers would purchase the policies.

   iii. Submitting applications to carriers that misrepresented the identity of the vehicle operator to hide the fact that the true operator had a problematic driving history that would have led the carrier to decline the policy or to charge a higher premium.

   iv. Forging consumers' signatures on applications to carriers.

### Blackstone's Roadside Assistance Program ("RAP")

  8. Based on my participation in the investigation, my conversations with other law enforcement agents and others, and my review of records obtained through grand jury subpoena, I have learned, among other things, that:

   a. The RAP is offered through a third-party vendor (the "RAP Vendor").  The RAP Vendor typically contracts with other companies, such as insurance brokerage firms, who can offer roadside assistance services to customers who are seeking insurance policies.  The brokerage firms often offer the RAP under a name different than the one used by the RAP Vendor.

   b. The insurance brokerage firms pay the RAP Vendor a fixed price per customer.  The insurance brokerage firms then charge the customer a fee for the RAP.

  9. Based on my review of contracts between Blackstone and the RAP Vendor, I have learned, among other things, that:

   a. On or about May 6, 2013, Blackstone entered into a contract with the RAP Vendor (the "May 6 Blackstone RAP Contract").  Pursuant to the May 6 Blackstone RAP Contract, Blackstone "engage[d] [the RAP Vendor] at a service fee of $3.75 per member yearly plus the cost of road side service, to provide its members with toll-free access to [the RAP Vendor's] 24-hour

emergency service network."[2] CW-1 recognized the signature on the May 6 Blackstone RAP Contract as the Credidio Signature.

        b.    Pursuant to the May 2013 contract, Blackstone offered the RAP to its customers under the name "Blackstone Roadside Services." Through this program, Blackstone offered its customers the opportunity to make a maximum of five calls for emergency roadside service per year, with the cost for each service capped at $50.

        c.    On or about September 23, 2013, Blackstone entered into another contract with the RAP Vendor (the "September 23 Blackstone RAP Contract"). Pursuant to the September 23 Blackstone Contract, Blackstone "engage[d] [the RAP Vendor] at a service fee of $3.75 – 1st year + $2.00 each add'l year up to 5 year – per member yearly . . . ." CW-1 recognized the signature on the September 23 RAP Blackstone Contract as the Credidio Signature.

    10.    Based on my review of emails exchanged between employees of the RAP Vendor concerning "Blackstone Roadside Services," including the emails described below, I have learned, among other things, that:

        a.    On or about September 20, 2013, an employee of the RAP Vendor ("Employee-1") sent an email to another employee of the RAP Vendor ("Employee-2"). In the email, Employee-1 writes "[d]id anyone see how much they [Blackstone] are charging for the motor club? We are getting 3.00 and they [Blackstone] charge 250.00 to 500.00 per year. For a 1 yr $50 limit motor club?"

        b.    Later on or about September 20, 2013, Employee-2 sent an email to Employee-1 and two other RAP Vendor employees ("Employee-3" and "Employee-4"). In the email, Employee-2 wrote "I spoke with [Employee-3] and then with Nancy at Blackstone." Employee-2 went on: ". . . they were not covering just 1-$50.00 claim per 12 months, they were covering 5 calls per 12 months. . . . Please adjust their website to offer multiple year terms." Later in the email, Employee-2 wrote "[Nancy] stated most deals will be the 4 year and she will sell that for $465.00. (remember, she is offering 5 calls per year)."

---

[2] Any descriptions of emails, documents, or communications in this Complaint are of the sum and substance of the email, document, or communication, and in relevant part.

   c. On or about September 23, 2013, Employee-2 sent an email to NANCY CREDIDIO, a/k/a "Nancy Schwartz," the defendant, at the Credidio Email Account. In the email, Employee-2 wrote "[i]t was a pleasure to speak with you last week and I am glad we could assist you in fine tuning your [RAP] to avoid potential problems. The multi-year options should be a nice fit/solution for your agency." Later in the email, Employee-2 asked "[d]o you want us to pre-program the pricing for your customers on your site? (Example - 4 yr at $465)".

   d. Later on or about September 30, 2013, Employee-2 sent an email to Employee-3 and Employee-4. In the email, Employee-2 wrote "I have copied you on all emails to Nancy at Blackstone regarding the changes to their MC. Now called AAA Roadside Services." Employee-2 goes on to write "I have spoken to Nancy today and she is very happy with those options and will be sending me the new signed contract today. They do not want us to pre-program their customer pricing."

### **Fraudulent Insurance Applications Submitted by Blackstone**

#### *Victim-1*

 11. During my interview of an individual ("Victim-1"), who purportedly purchased an insurance policy through Blackstone, Victim-1 stated, in substance and in part, that:

   a. On or about November 11, 2013, Victim-1 visited an automobile dealership ("Dealer-1") to purchase a car. Victim-1 decided to purchase a vehicle, and asked about an insurance policy. An employee of Dealer-1 ("Dealer Employee-1") told Victim-1, in substance and in part, that Blackstone would arrange for Victim-1's automobile liability insurance policy and could get Victim-1 a defensive driving certificate, which would lower her insurance premium.

   b. At no point during the purchase of the vehicle did Victim-1 sign an application or finance agreement for insurance coverage.

 12. Based on my review of applications submitted through Blackstone for insurance policies and documents obtained from the RAP Vendor, I know, among other things, that:

   a. Also on November 11, 2013, but after Victim-1's visit to Dealer-1, Blackstone faxed to Dealer-1 a document (the "Fax") requesting that Victim-1 submit a deposit of

7

approximately $1,100, and enclosing an alleged insurance identification card (the "ID Card"). The name "Nancy" was handwritten at the top of the Fax. The ID Card identified as Victim-1's carrier a company that does not provide liability coverage in New York ("Carrier-1"), and in fact, did not insure Victim-1's vehicle.

   b. On or about November 11, 2013, at approximately 6:28 pm, Blackstone submitted an application (the "Victim-1 Application") electronically to AIPSO on behalf of Victim-1. In addition to the application, an agreement to finance the insurance was also submitted electronically to AIPSO on behalf of Victim-1 (the "Victim-1 Finance Agreement"). Both documents were purportedly signed by Victim-1.

   c. On or about December 2, 2013, the Victim-1 Application and the Victim-1 Finance Agreement were received via United States mail at the NYAIP office in New York, New York. The Victim-1 Application was assigned to a carrier ("Carrier-2") on or about November 15, 2013.

   d. The Victim-1 Application purported to show that Blackstone only received a $50 broker's fee, which, as described above, would be the maximum fee allowed by law for the type of insurance policy sold to Victim-1. The Victim-1 Application also shows, however, that Victim-1 was sold a RAP for $465. According to the RAP application (the "Victim-1 RAP Application"), the RAP that was purportedly sold to Victim-1 was only for a one-year term, as opposed to the four-year term that NANCY CREDIDIO, a/k/a "Nancy Schwartz," the defendant, had told the RAP Vendor would be offered for $465. Records from the RAP Vendor also show that Blackstone paid the RAP Vendor $3.75 for enrolling Victim-1 in the RAP, which is the cost set forth in the September 23 RAP Contract for a one-year RAP.

  13. The following occurred, in substance and in part, during my interviews of Victim-1:

   a. Victim-1 stated, in substance and in part, that within a month of purchasing the vehicle, Victim-1 went to the Blackstone office to pick up Victim-1's defensive driving certificate. Victim-1 asked for "Nancy," whom Dealer Employee-1 had told Victim-1 was his contact at Blackstone. A woman then came out to give Victim-1 the defensive driving certificate.

   b. I showed Victim-1 a photograph of NANCY CREDIDIO, a/k/a "Nancy Schwartz," the defendant. Victim-1 confirmed, in sum and substance, that the woman in the photograph was the

8

woman who gave Victim-1 the defensive driving certificate at Blackstone.

   c. I showed Victim-1 the Victim-1 Application, Victim-1 Finance Agreement, and Victim-1 RAP Application. Victim-1 stated, in substance and in part, that Victim-1 had never seen those documents before, and that the signatures on those documents did not belong to Victim-1. Victim-1 also said, in substance and in part, that Victim-1 had no need to buy a roadside assistance program from Blackstone, because Victim-1 had roadside assistance coverage through another source.

  14. During an interview of CW-1, CW-1 identified the signature on the Victim-1 Application as the Credidio Signature.

### *Victim-2*

  15. During my interview of an individual ("Victim-2"), who purportedly purchased an insurance policy through Blackstone, Victim-2 stated, in substance and in part, that in or about 2009, Victim-2 visited an automobile dealership and leased a vehicle ("Vehicle-1"). Victim-2 financed the lease through a lender ("Lender-1"). To secure insurance for Vehicle-1, Victim-2 spoke with "Nancy" at Blackstone, but never met with anyone from Blackstone in person.[3]

  16. Based on my conversations with others and my review of applications submitted through Blackstone for insurance policies and documents obtained from the RAP Vendor, I know, among other things, that:

   a. On or about December 14, 2012, Lender-1 repossessed Vehicle-1. On or about February 22, 2013, Lender-1 auctioned off Vehicle-1. After the repossession, Victim-2 no longer retained any interest in Vehicle-1.

   b. On or about September 11, 2013, Blackstone electronically submitted an application (the "Victim-2 Application") to insure Vehicle-1 in Victim-2's name to AIPSO. On or about September 20, 2013, the Victim-2 Application was delivered by United States mail to the NYAIP office in New York, New York.

---

[3] Based on my participation in the investigation and my conversations with others, I know that NYAIP requires that insurance brokers meet in person with consumers.

9

        c.   On or about September 17, 2013, the NYAIP assigned the Victim-2 Application to a carrier ("Carrier-3"), and a policy was written (the "Victim-2 Policy"). The Victim-2 Application was purportedly signed by Victim-2.

        d.   On or about November 4, 2013, Blackstone electronically submitted an endorsement (the "Endorsement") in Victim-2's name replacing Vehicle-1 as the insured automobile under the Victim-2 Policy with another vehicle ("Vehicle-2"). The Endorsement was purportedly signed by Victim-2, even though Vehicle-2 had no connection to Victim-2 or any of Victim-2's friends or household family members.

    17.   During my interview of Victim-2, I showed Victim-2 the Victim-2 Application and Endorsement. Victim-2 stated, in sum and substance, that Victim-2 had never seen those documents before, and that the signatures on those documents did not belong to Victim-2.

### *Victim-3*

    18.   During my interview of an individual ("Victim-3"), who purportedly purchased an insurance policy through Blackstone, Victim-3 stated, in substance and in part, that Victim-3 had recently purchased a vehicle from an automobile dealership in the Bronx, New York. In connection with that purchase, upon the recommendation of the salesperson at the dealership, Victim-3 called "Nancy" at Blackstone about acquiring an insurance policy. Victim-3 never visited Blackstone or met in person with anyone from Blackstone. Victim-3 believed that paperwork would be submitted that would jointly name Victim-3 and Victim-3's spouse ("Relative-1") as the policyholders.

    19.   Based on my review of applications submitted through Blackstone for insurance policies and documents obtained from the RAP Vendor, I know, among other things, that:

        a.   On or about October 3, 2014, AIPSO received an application in the name of Relative-1 (the "Victim-3 Application"). The Victim-3 Application is purportedly signed by Victim-3.

        b.   The Victim-3 Application reflected that Blackstone received a $50 broker fee. The Victim-3 Application also contained a RAP application (the "Victim-3 RAP Application"), which showed that Victim-3 was purportedly sold a single-year membership in Blackstone's RAP for approximately

$465. The Victim-3 RAP Application is purportedly signed by Victim-3.

20. During my interview of Victim-3, I showed Victim-3 the Victim-3 Application and Endorsement and the Victim-3 RAP Application. Victim-3 denied signing the Victim-3 Application and the Victim-3 RAP Application.

### *Victim-4*

21. During my interview of an individual ("Victim-4"), who purportedly purchased an insurance policy through Blackstone, Victim-4 stated, in substance and in part, that:

   a. On or about April 16, 2014, Victim-4 purchased a vehicle ("Vehicle-3") from a car dealership in Queens, New York. The salesperson told Victim-4 that Victim-4 could obtain insurance through Blackstone, with the help of a person named "Nancy." Victim-4 never met with "Nancy" or any other Blackstone representative.

   b. Victim-4 believes that he or she signed paperwork in connection with an insurance policy at the dealership.

   c. Victim-4 denied signing up for any roadside coverage and in fact, did not believe that any such coverage would be necessary because Victim-4 had purchased a warranty with Vehicle-3.

22. Based on my review of applications submitted through Blackstone for insurance policies and documents obtained from the RAP Vendor, I have learned that AIPSO received an application in the name of Victim-4 (the "Victim-4 Application") for coverage under NYAIP, which reflects that Victim-4 was purportedly charged a $50 brokerage fee. The Victim-4 Application also contains an application for the RAP (the "Victim-4 RAP Application"), which shows that Victim-4 received a one-year membership in the RAP for approximately $475.

### *Additional Victims*

23. Based on my review of financial records, I have learned, in substance and in part, the following:

11

      a.    In total, during the period in which it offered the RAP, Blackstone charged its customers approximately $418,664.34 in connection with its RAP.

      b.    In total, Blackstone collected payment from 1,182 individuals for a RAP. Victim-1, Victim-3, and Victim 4 were among those 1,182 individuals who paid for a RAP.

      c.    During the same time period, Blackstone paid approximately $4,471 to the RAP Vendor and paid out approximately $2,851.18 in claims filed by RAP policyholders.

### The June 2016 Interview of CREDIDIO

24.    On or about June 22, 2016, I, among others, interviewed NANCY CREDIDIO, a/k/a "Nancy Schwartz," the defendant. After being advised of the identities of those present at the interview, CREDIDIO voluntarily agreed to make a statement. During the interview, CREDIDIO stated, in substance and in part, that:

      a.    She had worked at Blackstone since approximately 2010. CREDIDIO claimed that she was the "front man" for CC-1, i.e., the manager of Blackstone.

      b.    She had previously worked at other insurance brokerage firms, and had a lengthy tenure in the insurance industry.

      c.    She did not have a broker's license, and had not taken the tests required for such a license.

      d.    She advised that at Blackstone, all policies written included a $465 broker fee. CREDIDIO knew, however, that the maximum broker fee that could be charged for a NYAIP policy was $50.

      e.    When shown documents related to the Blackstone RAP, CREDIDIO acknowledged that she had sold the RAP to customers. She further indicated that she knew that the RAP provided for roadside assistance five times per year, and that each instance was capped at $50. CREDIDIO agreed that the cost charged by Blackstone for the RAP was excessive, but claimed that customers were told that they were purchasing the RAP at the time of the sale. CREDIDIO admitted, however, that the price at which the RAP was charged was used to cover

Blackstone's charging excessive broker fees, including broker fees for NYAIP policies in excess of $50.

WHEREFORE, the deponent respectfully requests that a warrant issue for the arrest of NANCY CREDIDIO, a/k/a "Nancy Schwartz," the defendant, and that she be imprisoned or bailed, as the case may be.

MICHAEL BIRLEY
Special Agent, FBI

Sworn to before me this
17th day of October, 2017

HONORABLE SARAH NETBURN
United States Magistrate Judge
Southern District of New York

13