



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 1, 2020

**BY ECF**

The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
Thurgood Marshall U.S. Courthouse
New York, New York 10007

> Re:  **United States v. Nancy Credidio,**
>      **19 Cr. 111 (PAE)**

Dear Judge Engelmayer:

The Government respectfully submits this letter in response to the Court's Order, dated March 30, 2020. (Dkt. 62). That Order directs the parties to address whether the Court "has legal authority" to pause a sentence that a defendant is already serving, order that defendant released temporarily to home incarceration, and then have that defendant re-committed to the Bureau of Prisons ("BOP") at a later date to finish serving her sentence. The later date contemplated by the Order is either the defendant's designation to a longer-term federal prison, or when the present public health crisis abates—whichever occurs first. (*Id.*).

The Government has carefully canvassed the federal code. While the Government is extremely sensitive to the very real concerns at stake, the Government is unaware of any legal authority that would permit the Court to so act. As explained below, however, other entities may have such power, at least under certain circumstances and to a certain extent. That is one of several reasons that the defendant may elect to seek potential administrative remedies from the Bureau of Prisons ("BOP"), rather than file a motion with the Court in the first instance, as the defendant has done here.

This letter first addresses the defense's argument seeking habeas corpus relief pursuant to 28 U.S.C. § 2241 (Dkt. 64 (Def. Letter)), and then briefly addresses the potential for relief under other authorities.

## I. **A Writ of Habeas Corpus Is Unavailable Here**[1]

    A. <u>Applicable Law</u>

28 U.S.C. § 2241(c)(3) allows federal courts to entertain habeas corpus petitions from federal prisoners who are "in custody in violation of the Constitution or laws or treaties of the United States." A motion under § 2241 "generally challenges the execution of a federal prisoner's sentence, including such matters as the administration of parole, computation of a prisoner's sentence by prison officials, prison disciplinary actions, prison transfers, type of detention and prison conditions." *Jiminian v. Nash*, 245 F.3d 144, 146 (2d Cir. 2001) (citing *Chambers v. United States*, 106 F.3d 472, 474–75 (2d Cir. 1997)).

"[T]he Second Circuit has held in no uncertain terms that an inmate must exhaust his administrative remedies prior to seeking relief under Section 2241," even though administrative exhaustion is not required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a). *Atkinson v. Linaweaver*, No. 13 Civ. 2790 (JMF), 2013 WL 5477576, at *1 (S.D.N.Y. Oct. 2, 2013); *see also Carmona v. U.S. Bureau of Prisons*, 243 F.3d 629, 634 (2d Cir. 2001) ("[F]ederal prisoners must exhaust their administrative remedies prior to filing a petition for habeas relief.") (citing *Guida v. Nelson*, 603 F.2d 261, 262 (2d Cir. 1979)); *Gonzalez v. Perrill*, 919 F.2d 1, 2 (2d Cir. 1990) (holding that a prisoner must exhaust his administrative remedies unless they would not provide adequate redress). The exhaustion requirement serves a number of institutional interests, including (1) permitting those with expertise in prison administration to attempt to resolve issues in the first instance, and (2) developing a record that permits meaningful review by the Court in those instances where judicial involvement is ultimately required. *See Beharry v. Ashcroft*, 329 F.3d 51, 62 (2d Cir. 2003) (the exhaustion requirement "protect[s] the authority of administrative agencies, limit[s] interference in agency affairs, develop[s] the factual record to make judicial review more efficient, and resolv[es] issues to render judicial review unnecessary.").

Failure to exhaust "constitutes a procedural default that bars judicial review unless the petitioner makes a showing of cause and prejudice." *Atkinson*, 2013 WL 5477576, at *1 (citing *Carmona*, 243 F.3d at 634). This failure may be excused for cause "when such exhaustion would be futile or where the agency has predetermined the issue before it." *Garcia v. Shanahan*, 615 F. Supp. 2d 175, 180 (S.D.N.Y. 2009) (internal quotation marks omitted).

    B. <u>Administrative Exhaustion</u>

In this case, the defendant has not exhausted any potential administrative remedies, including seeking to expedite her transfer to the BOP facility at which she will serve the bulk of her sentence. Her failure to exhaust is reason alone to deny her motion at this time, without

---

[1] The Government notes that, in her plea agreement, the defendant expressly waived her right to bring a challenge, under 28 U.S.C. § 2241, so long as the Court sentenced her to 37 months' imprisonment or less. She received a 33-month sentence (Dkt. 58) and has therefore waived her right to bring this challenge. Nevertheless, recognizing the spirit of the Court's Order, the Government addresses the merits of the defendant's claim as well, to illustrate that, even absent waiver, the defendant would not be entitled to relief.

prejudice to a future motion if her application for relief is denied by the BOP. This failure should not be excused, as there no evidence that the BOP has "predetermined the issue before it"; in fact, as far as the Government is aware, the defendant has not sought to press the issue of her designation to a long-term BOP facility. Under these circumstances, judicial review is "bar[red]" until the defendant first seeks to resolve the issue of her long-term designation with the BOP.

C. The Merits

On the merits, her motion fares no better. The defense does not specify how the conditions of confinement are allegedly unconstitutional, save for an oblique reference to the "deliberate indifference" standard. (Def. Letter 3). As the U.S. Supreme Court has held, "deliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment's proscription on cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). As such, an Eighth Amendment violation is cognizable under § 2241. But the standard is extremely high, and is plainly not met here.

"The Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). "In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners." *Id.* (citing *Hudson v. McMillian*, 503 U.S. 1 (1992)). The Eighth Amendment also requires that prison officials "ensure that inmates receive adequate food, clothing, shelter, and medical care, and [prison officials also] must "take reasonable measures to guarantee the safety of the inmates." *Id.* (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–527 (1984)).

An Eighth Amendment violation has two elements. First, a "prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities," which can include incarceration "under conditions posing a substantial risk of serious harm." *Id.* at 834 (citation and internal quotation marks omitted). Second, "the offending conduct must be *wanton*." *Wilson v. Seiter*, 501 U.S. 294, 302 (1991). Whether conduct "can be characterized as 'wanton' depends upon the constraints facing the [prison] official." *Id.* at 303. The "wantonness" of conduct does *not* depend upon its effect on the inmate. *Id.* The Supreme Court's "cases mandate inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment." *Farmer*, 511 U.S. at 838. Deliberate indifference requires "more than mere negligence." *Id.* at 835.

Applying these principles here, the constitutional question is not a close call. The BOP's response to the COVID-19 pandemic has been anything but indifferent; rather, the BOP has been extremely attentive. The BOP has acted rapidly, thoughtfully, and extensively to fight the COVID-19 pandemic and keep inmates healthy; the BOP's measures have been commensurate with the gravity of this health crisis. The Government is quite sympathetic to the severity of the defendant's concerns. It is also true, however, that she is a healthy 72-year-old and that there are likely thousands of inmates over the age of 70 who, like her, have committed serious crimes and are serving well-deserved sentences. It would therefore set a dangerous precedent to grant the relief the defendant seeks, on the basis that she is at risk of infection from an epidemic—a risk that would

also exist if she were at liberty. Under such circumstances, the mere risk of infection cannot be—and is not—an Eighth Amendment violation; COVID-19 is an extremely serious problem, but the BOP has taken—and continues to take—significant, timely action to ensure inmate health and safety. Some of these safety measures are discussed next.

As the Court is likely aware from bail-related litigation in other cases, since at least October 2012, the BOP has had a Pandemic Influenza Plan in place.[2] In January 2020, the BOP began to plan specifically for COVID-19 to ensure the health and safety of inmates and BOP personnel.[3] As part of its Phase One response to COVID-19, the BOP began to study "where the infection was occurring and best practices to mitigate transmission." *Id.* In addition, the BOP assembled "an agency task force" to study and coordinate its response to COVID-19, including using "subject-matter experts both internal and external to the agency including guidance and directives from the WHO, the CDC, the Office of Personnel Management (OPM), the Department of Justice (DOJ) and the Office of the Vice President." *Id.* On March 13, 2020, the BOP implemented its Phase Two response "in order to mitigate the spread of COVID-19, acknowledging the United States will have more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff." *Id.*

The BOP has implemented various measures designed to "ensure the continued effective operations of the federal prison system and to ensure that staff remain healthy and available for duty." *Id.* For example, the BOP (a) suspended social visits for 30 days (but increased inmates' access to telephone calls); (b) suspended legal visits for 30 days (with case-by-case accommodations); (c) suspended inmates' movement for 30 days (with case-by-case exceptions, including for medical treatment); (d) suspended official staff travel for 30 days; (e) suspended staff training for 30 days; (f) restricted contractor access to BOP facilities to only those performing essential services, such as medical treatment; (g) suspended volunteer visits for 30 days; (h) suspended tours for 30 days; and (i) generally "implement[ed] nationwide modified operations to maximize social distancing and limit group gatherings in [its] facilities." *Id.*

The BOP also implemented screening protocols for both BOP staff and inmates, with staff being subject to "enhanced screening" and inmates being subject to screening managed by its infectious disease management programs. *Id.* As part of the BOP's inmate screening process, (i) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (ii) "[a]symptomatic inmates with exposure risk factors are quarantined"; and (iii) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols." *Id.*

The specific measures implemented at the MCC (where the defendant is housed) are described in a letter that the BOP submitted to Chief Judge McMahon on March 18, 2020, attached hereto as Exhibit A. Those measures include:

---

[2] *See* BOP Health Management Resources, https://www.bop.gov/resources/health_care_mngmt.jsp.2.

[3] *See* Federal Bureau of Prisons COVID-19 Action Plan, https://www.bop.gov/resources/news/20200313_covid-19.jsp.

- <u>Screening of staff</u>: All MCC staff are screened every day upon arrival by medical staff wearing personal protective equipment. Any staff person with a fever or responding in the affirmative to any question on a screening form is denied entrance.

- <u>Suspension of new inmates</u>: At present, the MCC is not accepting new inmates.

- <u>Medical staff availability</u>: All medical staff are now available around the clock.

- <u>Isolation of at-risk population</u>: Inmates over 55 years old or with certain conditions are isolated within one unit at the MCC, with some exceptions relating to security concerns.

- <u>Suspension of visits</u>: Social and legal visits have been suspended. To compensate, additional telephone minutes for social calls and legal calls have been provided to all inmates.

- <u>Cleaning and hygiene</u>: Soap was delivered to all inmates the weeks of March 9, 16, 23, and 30. Additional soap is available for purchase and soap is provided at no cost to any inmate who cannot afford to purchase it. The MCC continues to be stocked with cleaning supplies and common areas are cleaned on a regular basis.[4]

Doubtless, notwithstanding the measures above, the MCC will not be completely immune to a virus that is projected to infect 40 to 80 percent of the overall population of the United States.[5] To date, the Government is aware of four confirmed cases of COVID-19 among MCC inmates (and three more among MCC staff), out of a total inmate population of approximately 700; it is possible that there will be additional cases in the coming weeks and months. However, given the measures that the BOP has implemented and the inherently isolated, controlled nature of the prison environment, there is no reason to believe that the defendant is at materially greater risk from COVID-19 at the MCC than she would be if released. That is especially true here, where the defendant has proposed release into the city that is, sadly, the global epicenter of this health crisis. (*See* Dkt. 61, at p. 17 ("If released to home confinement, Ms. Credidio will reside with her sister Barbara Hendricks in Queens.")). Thus, while undoubtedly the defendant is at risk of infection at the MCC, that would clearly also be the case upon her release, and even if it could be determined with any degree of certainty that she was marginally *more* at risk at the MCC, that marginal difference in risk would not amount to an Eighth Amendment violation.

\*   \*   \*

---

[4] Just today, the BOP implemented another stage of its action plan by instituting a 14-day quarantine for all inmates at every BOP facility. To the extent practicable, inmates will continue to have access to programs and services, such as mental health treatment and education.

[5] *See* Transcript of March 22, 2020 Remarks of Governor Andrew Cuomo, https://www.governor.ny.gov/news/video-audio-photos-rush-transcript-governor-cuomo-calls-covid-19-pandemic-challenge-generation.

None of the cases cited by the defense even remotely resembles the situation here. (Def. Letter 4–5). As a preliminary matter, none of them involved a federal, criminal defendant serving a sentence—the critical fact that curtails the Court's authority. Specifically, several of the cases cited by the defense are from the state-court system, whose laws obviously differ; in other cases cited, release was granted under the Bail Reform Act, which does not apply to sentenced defendants;[6] in still other cases cited, defendants not yet serving their sentence were permitted adjournments of the date by which they need to report to the BOP to begin serving their sentence (which is also governed by the Bail Reform Act); and the final category of cited cases concerns release from immigration custody, a plainly different context involving a different jail system.[7] The defense also tries to label the *Roba v. United States* decision as "instructive" (Def. Letter 3), but that decision did not reach the merits of the habeas corpus claim; it simply directed the district court to determine whether petitioner's health precluded transfer from New York to California. 604 F.2d 215, 218–19 (2d Cir. 1979).

Yesterday, however, Judge Furman issued a decision that is instructive. The defendant in that case, Nkanga Nkanga, had been remanded following his 2018 guilty plea and was ultimately sentenced on March 12, 2020 to 36 months' imprisonment. Thus, defendant Nkanga is—like defendant Nancy Credidio—currently serving a federal, criminal sentence. Under these circumstances, Judge Furman held that "the Court is powerless" to order defendant Nkanga

---

[6] In fact, one of those decisions involved a defendant who was released in part because an evidentiary hearing was scheduled for six days later. *See United States v. Stephens*, 2020 WL 1295155 (AJN), at *2–3 (S.D.N.Y. Mar. 19, 2020).

[7] To be sure, the immigration-custody cases involved § 2241, but the circumstances of those cases were dramatically different, both as to plaintiffs' health conditions and as to the conditions in immigration custody. As to plaintiffs' health conditions, the plaintiffs had "chronic" health issues; one had heart disease and "ongoing chest pain," but was unable to see a cardiologist in custody—a textbook example of an unmet, serious medical need; another had previously experienced the removal of their kidney, part of their lung, and part of their liver. *Coronel v. Decker*, 20 Civ. 2472 (AJN), Dkt. 26, pp. 1, 2, 12. As to the conditions in immigration custody, Judge Nathan found:

> the record contains no evidence that the Government took any specific action to prevent the spread of COVID-19 to high-risk individuals, like the Petitioners, currently being held in civil detention. It has not isolated these high-risk individuals. It has not created special safety or hygiene protocols for them or for staff interacting with them to follow. It has not implemented a protocol to test individuals coming into jails or individuals who are in jails, either for COVID-19 itself or even for a high fever.

*Id.* at 10–11. Judge Nathan further noted that "the Department of Homeland Security's own 'medical subject matter experts' state that the agency has a 'track record . . . of failing to develop early detection and containment protocols for infectious diseases outbreaks' and point out problems with detention facilities' protocols surrounding screening, testing, and isolation.'" *Id.* at 9. As noted above, none of these various shortcomings is present at BOP facilities.

"temporarily released from custody until circumstances improve," even though he described temporary release as "the rational and right result."[8] *United States v. Nkanga*, 18 Cr. 713 (JMF) (Dkt. 87, at p. 9) (S.D.N.Y. Mar. 31, 2020).[9]

## II. The Government is Unaware of Any Legal Basis for the Court to "Pause" a Partially Served Sentence

For purposes of completeness, the Government notes that it has considered several other potential bases in response to the Court's Order. However, the Government cannot find any legal authority that would permit the Court to essentially hit the "pause" button on a sentence that, like the defendant's, has been partially served. The following list is derived in part from this Court's recent analysis in *United States v. Hernandez*, 18 Cr. 834 (PAE), Dkt. 440 (S.D.N.Y. Mar. 25, 2020):

- Bail Reform Act:  The statute authorizing the temporary release of defendants awaiting trial or sentence, 18 U.S.C. § 3142(i), does not apply to sentenced defendants.

- Federal Rules of Criminal Procedure:

    o Rule 35(a), which permits modifications of sentences to correct technical errors if made within 14 days of sentencing, does not apply.  Sentencing took place nearly two months ago on February 7, 2020, and no errors were made.

    o Rule 35(b), which provides for a reduction of sentence on a Government motion based on substantial assistance rendered after sentencing, also does not apply. There has been no such motion here.

    o Rule 33(a), which gives the Court power to vacate a judgment and grant a new trial in the interests of justice, also does not apply.  By its express terms, Rule

---

[8] At the time of Judge Furman's decision, defendant Nkanga had not sought relief pursuant to 28 U.S.C. § 2241.  The defendant has since filed such a motion.

[9] While the parties' focus, at present, concerns the issue of legal authority, it is worth noting that the lack of such authority—and the lack of any precedent—has several practical implications.  For example, if the defense's request is granted, who decides when the present public health crisis has "abated," such that the defendant can begin resume her sentence?  How few COVID-19 cases do there need to be? What legal standard applies? What is the basis for that standard? What happens if the number of cases is deemed low enough to qualify as "abatement," but then the number of cases increases when the seasons change?  Will the defendant then be released again?  The lack of clear answers to these practical questions, or the standards by which to make these determinations, counsels against an attempt to shoehorn into the habeas statute a mechanism to grant the unusual relief sought by the defendant.

>     33(a) applies only where a trial occurred; here, the defendant pleaded guilty and did not go to trial. (Dkt. 53).[10]

- § 3582: The "compassionate release" statute, 18 U.S.C. § 3582(c), does not apply for several reasons. It provides for the reduction of a prisoner's sentence only "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). On March 30, 2020, this Court denied the defendant's motion for compassionate release. (Dkt. 62). In addition, the defendant has not exhausted her administrative remedies; she first applied to the BOP for compassionate release on March 29, 2020. Moreover, it is not clear how the compassionate release statute could be used to "pause" the defendant's sentence, as opposed to simply reducing it, which, as the Court noted in its Order, would be inappropriate because "a lengthy term of imprisonment is required . . . for all the reasons reviewed at sentencing."[11] (Dkt. 62).

- § 3622: The statute authorizing temporary release of prisoners, under defined circumstances, for purposes including attending a funeral of a relative or obtaining medical treatment not otherwise available, 18 U.S.C. § 3622(a), does not apply, as the determination whether to grant such release resides with the BOP, not the sentencing court.

- § 3624: The statute authorizing release from custody for up to 10% of a sentence (which is served under home confinement), 18 U.S.C. § 3624(c), does not apply here. The determination whether to grant such release resides with the BOP, not the sentencing court. And such release is a form of early release that applies, by the statute's terms, during "the final months" of an inmate's sentence.

In sum, the Government is unaware of any legal authority that would permit the Court to order the temporary release of a defendant who has already served part of their sentence.

---

[10] *See*, *e.g.*, *United States v. Graciani*, 61 F.3d 70, 78 (1st Cir. 1995) ("By its express terms, Rule 33 is confined to those situations in which a trial has been had."); *United States v. Eberhard*, No. 03 Cr. 562 (RWS), 2005 WL 2172031, at *2 (S.D.N.Y. Sept. 8, 2005) ("Since Eberhard pled guilty in this case, no trial occurred; and, as he does not seek to withdraw his guilty plea at this time, his plea remains intact, rendering Rule 33 wholly inapplicable."); *United States v. Nkanga*, 18 Cr. 713 (JMF) (Dkt. 87) (same); *id.* ("Moreover, even if the Rule did apply, Dr. Nkanga has identified no 'real concern that an innocent person may have been convicted' and no other reason that 'letting a guilty verdict stand would be a manifest injustice.'") (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)).

[11] In her plea agreement, the defendant also waived the right to seek a sentence modification under under § 3582(c).

Hon. Paul A. Engelmayer April 1, 2020
U.S. District Judge Page 9

*   *   *

It bears repeating that the Government acknowledges the seriousness of the defendant's concerns and understands the spirit of the Court's Order. But while there are no *judicial* remedies, there may be other potential remedies, at least under certain circumstances and to a certain extent. Most notably, as soon as is safe to do so, the BOP could transfer the defendant to a facility with a lesser risk of exposure. As noted, 18 U.S.C. § 3622 supplies a basis for temporary release from prison, if the BOP determines that it is warranted. The BOP also has the power under 18 U.S.C. § 3624(c), in appropriate cases, to functionally reduce a sentence to a certain extent. Finally, as another Judge recently noted, legislation could also provide relief. *See United States v. Nkanga*, 18 Cr. 713 (JMF), Dkt. 87. In fact, some Members of Congress have already proposed legislation on this very issue. *See* James Turpin, *Sen. Kamala Harris wants release of federal prison inmates considered COVID-19 at-risk*, Mar. 25, 2020 (describing the proposed bill—tentatively entitled the Emergency Community Supervision Act of 2020—and the categories of inmates who might be eligible for immediate placement in community supervision, including the approximately 33,000 federal inmates over age 50), *available at* https://kmph.com/news/local/sen-kamala-harris-wants-inmates-considered-at-risk-for-covis-19-released-from-prison (last visited April 1, 2020).

## CONCLUSION

For the foregoing reasons, the Court should deny the defendant's request for a writ of habeas corpus ordering temporary release from custody.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By: _____
Michael D. Neff
Assistant United States Attorney
(212) 637-2107

cc: David A. Ruhnke, Esq. (via ECF)